[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16350
_____

D.C. Docket No. 4:13-cv-01279-RDP-JEO


SUMNAR ROBERT BREWSTER,

Petitioner-Appellant,

versus

GARY HETZEL,
ATTORNEY GENERAL, STATE OF ALABAMA

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(January 22, 2019)

Before ED CARNES, Chief Judge, BRANCH, and FAY, Circuit Judges.

ED CARNES, Chief Judge:

In olden days a number of methods were used to ensure that juries reached a

unanimous verdict. From the fourteenth through the eighteenth centuries, one

"method of accelerating unanimity" was to prohibit jurors from eating or drinking until they all agreed on a verdict.  3 William Blackstone, Commentaries *375. And if jurors did not unanimously agree on one before the judges left town, Blackstone recounted, "the judges are not bound to wait for them, but may carry them round the circuit from town to town in a cart."  Id. at *376.  They were hauled around in the cart "until a judgment 'bounced out.'"  Renico v. Lett, 559 U.S. 766, 780, 130 S. Ct. 1855, 1866 (2010) (Stevens, J., dissenting).  Which is to say until the resolve bounced out of the holdout jurors.

In one seventeenth-century sedition trial (involving William Penn and a co-defendant), the jury deadlocked on the most serious charge.  George C. Thomas III & Mark Greenbaum, Justice Story Cuts the Gordian Knot of Hung Jury Instructions, 15 Wm. & Mary Bill Rights J. 893, 898–99 (2007).  The judge responded by threatening to have a juror named Bushel branded unless the jury agreed that the defendants were guilty as charged.  Id. at 899.  When no verdict was forthcoming, the judge did not send for a branding iron, but he did have all the jurors "locked in the jury room without meat, drink, fire, and tobacco" until they could agree.  Id. (quotation marks omitted).  After nicotine withdrawal and the prospect of starvation failed to work, "the judge threatened to cut Bushel's throat" if there were no verdict.  Id.  (Thus posing the prospect of a dead juror to unlock a deadlocked jury.)  When even that threat did not bring forth a unanimous verdict,

the judge gave up.  Id.  Bushel escaped the experience unbranded and with his throat intact, while the jury as a whole escaped with its disagreement intact.  But the judge was angry enough at the jurors' failure to agree that he fined each of them forty marks for their intransigence.  Id.  Fortunately, when the case made it to the Court of Common Pleas the fines were set aside.  Id. at 899–900.  History does not record if Bushel or any of the eleven other brave souls ever served on another jury.

Since those days, we have come a long way and now accept that some jury deliberations will end in deadlock.  United States v. Rey, 811 F.2d 1453, 1460 (11th Cir. 1987) ("The jury trial system has not malfunctioned when the jury cannot reach a verdict. One of the safeguards against the conviction of innocent persons built into our criminal justice system is that a jury may not be able to reach a unanimous verdict.").  We no longer try to coerce holdout jurors to reach a verdict that they cannot abide.  Or at least most of the time we don't.

The jury that convicted our appellant, Sumnar Brewster, might feel some affinity with juries of yesteryear.  Over the period of two days of deliberations the jurors repeatedly told the judges — there was one judge on the first day of deliberations and a different one on the second day — that they could not reach a unanimous verdict.  And the judges repeatedly ordered them to keep trying.  All

3

told, the jurors sent six notes to the two judges stating that they could not reach a verdict.

Three times the jurors disclosed how they were divided: first reporting that they were deadlocked 9 to 3 for conviction, later that they were still deadlocked but now 11 to 1 in favor of conviction, and still later that the one holdout juror was continuing to hold out. Throughout the deadlocking, the judges gave a formal Allen charge, later two additional admonitions that the jurors must continue deliberating, and finally, another long charge that included instructions to keep on deliberating. That lengthy charge emphasized that the jurors had taken an oath to follow the law, which meant they must deliberate more. The judge ended his instructions with the challenge that he had taken his oath seriously and hoped they would do the same.

Shortly thereafter, when told that the one juror who wouldn't vote to convict was doing crossword puzzles, the judge ordered all the reading materials taken out of the jury room. That tactic turned out to be even more effective than threatening to kill the hapless Bushel had been in William Penn's case three hundred years before. Just 18 minutes after all reading materials were removed, Brewster's jury dutifully — and we do mean dutifully — returned a guilty verdict. Through it all Brewster's two attorneys neither objected nor moved for a mistrial. Not once.

4

This is Brewster's appeal from the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. He claims that his trial counsel rendered ineffective assistance by failing to object, or move for a mistrial, at any point during the deadlocked deliberations.

## I.

Here are the details. Brewster was tried on two counts of armed robbery. The case went to the jury at 11:23 a.m. on the second day of trial. About three-and-a-half hours later, at 2:55 p.m., the jury sent a note to the trial judge asking: "If one person on the jury votes not guilty, what is outcome?" The judge responded: "The Court cannot answer this question but will recharge you on any instructions you wish." There is no indication that the jury asked at that time to be recharged on anything or that they were.

Less than two hours later, at 4:20 p.m., the jury sent the judge a second note, which stated: "We are nine guilty and three not guilty. What instructions would you give us as to what to do now? Everyone is firm in their decision." The judge brought the jury into the courtroom and asked the foreman, "[D]o you think there's any way this case will be resolved on a unanimous verdict?" He answered "no." The judge responded by reading the jury Alabama's pattern <u>Allen</u> instruction, colloquially known as a dynamite charge. See <u>Allen v. United States</u>, 164 U.S. 492, 501–02, 17 S. Ct. 154, 157 (1896); <u>Dailey v. State</u>, 828 So. 2d 344, 346–47

(Ala. Crim. App. 2002).  Among other things, the judge informed the jurors that if they could not agree on a verdict, "a mistrial would be declared and this case would have to be tried again."  He told them that each juror was "entitled to his or her opinion of the evidence" and that none of them should "surrender an honest conviction," but he directed them to talk over their differences and to "make further efforts to arrive at a verdict" if they could conscientiously do so.  The jurors deliberated for another half-hour before being sent home for the day.

The jury returned at 9:00 the next morning and continued deliberating.  For reasons not explained in the record, another judge took over from the one who had presided the day before.  At 10:57 a.m., almost two hours after deliberations had resumed that morning, the jurors sent out a third note.  That note, as recounted by the judge, stated that they could not reach a unanimous decision, that one juror had decided not guilty, and that "no amount of time was going to sway them."  The judge brought the jurors into the courtroom and instructed them to "keep an open mind and go back point by point over the evidence that you have heard in this case and the law that was given to you by the Court and to keep deliberating."  The jurors returned to the jury room at 11:00 a.m.

Nearly three hours later, at 1:45 p.m., in a fourth note, the jury once again declared itself deadlocked — really, really deadlocked — telling the judge, as he informed the attorneys, that "all jurors have decided firmly, eleven guilty, one not

6

guilty, <u>no possibility of resolve</u>." (Emphasis added.)  The State requested that the judge give the <u>Allen</u> charge again, but instead he gave the jury a written instruction ordering it to continue deliberating and telling the jurors if they needed to be "reinstructed on any elements of the crime, count one or count two, or reinstructed on any issues, i.e., the burden of proof or reasonable doubt," the court would reinstruct them.  The jury did not ask for any more instructions.

At 2:02 p.m., the jury sent a fifth note, telling the judge that the lone holdout juror was "unwilling to discuss the case with them."  The judge brought the jury back into the courtroom and gave it the longest additional instruction yet, covering seven-and-a-half pages of the transcript.  He began by asking the jurors:  "Do you remember . . . [y]ou all took a solemn oath that you would well and truly try all issues submitted to you and true verdicts render . . . according to the evidence in the case and the law as given to you by the Court?"  He went on:  "You are not at liberty to just ignore the instructions of the Court.  I'm not telling you to change your mind, but I am asking you and reminding you of the oaths that you took and to take those seriously and to deliberate this case and talk."  In his instruction, the judge used the word "oath" nine times.  He also reminded the jury that "beyond a reasonable doubt" does not mean absolute certainty, and that "[t]here is no such thing as absolute certainty in human affairs.  For justice is after all, but an

approximate science."  The judge concluded his lengthy instructions by telling the jury:

> I have indicated to you that there's two counts.  I have reminded you of the oath that you have taken.  I have given you reinstructions on reasonable doubt.  I want you to go back, and I want you to continue to deliberate.  Start at the beginning, if you have to.  Go over every element or any part of this case you want to discuss.  <u>But you took an oath.  I take mine seriously.  I hope you do the same.  Take them out.</u>

 (Emphasis added.)

The jurors went back into the jury room for more deliberations at 2:14 p.m. Eleven minutes later, at 2:25 p.m., out came the jury's sixth note.  It stated that the holdout juror was refusing to discuss the case and had begun doing crossword puzzles.  The judge responded by ordering the bailiff "to go to the jury room and take all of the newspapers and all of the books and magazines — and whatever they need to write on is fine and dandy.  Remove the others."  Eighteen minutes later, deprived of a way to shield herself from the importuning of the other jurors, the holdout held out no more.  At 2:48 p.m., a unanimous guilty verdict, to use the old term, "bounced out" of the jury room.  Convicted of both counts of armed robbery, Brewster was sentenced to life imprisonment without parole.

## II.

The Alabama Court of Criminal Appeals affirmed Brewster's conviction and sentence in a two-paragraph opinion.  <u>Brewster v. State</u>, 51 So. 3d 407 (unpublished table decision) (Ala. Crim. App. 2009).

8

Brewster petitioned the state trial court for postconviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. He claimed, among other things, that his trial counsel were ineffective for failing to move for a mistrial based on the jurors' repeated declarations that they were deadlocked "and/or" failing to object to the court's repeatedly ordering the jurors to continue deliberating. This is how his pro se petition stated that claim:

> Counsel w[ere] Ineffective and Petitioner was prejudiced thereby when counsel fail[ed] to move for a mistrial and/or object to the Court further instructing the jury after the jury indicated that they were deadlocked.
>
> Petitioner avers that the record in this case[] reveals that the jury could not reach a verdict on the charges against the petitioner, the jury indicated on several occasions that they were deadlocked. The Court gave several instructions for the jury to continue to deliberate, however the jury returned and stated that they were deadlocked and could not reach a verdict.
>
> The Trial Court, this time, with a substitute judge, again instructed the jury to reach a verdict.
>
> Petitioner contends that he was prejudiced by the Court's multiple charges to the jury to continue to deliberate as such coerced the j[u]ry into reaching a verdict.
>
> Counsel['s] error in this regard[] prejudiced the petitioner and deprived him of a fundamental fair trial.

 (Citations omitted.)

The state post-conviction court summarily dismissed Brewster's petition. The Court of Criminal Appeals vacated that dismissal and remanded the case for

9

the trial court to take evidence and enter findings of fact. On remand, the trial court did that and denied relief.[1] This is what that court said about why it was rejecting Brewster's claim that his counsel were ineffective for failing to object or move for a mistrial based on the jury's repeated statements that it was deadlocked and the judges' repeated instructions ordering it to keep deliberating:

> It is well settled in this State that an <u>Allen</u> charge in a criminal case is proper so long as it is not coercive or threatening. Here, Appellant states that the jury was coerced into reaching a verdict; but <u>he fails to cite the language that he finds coercive or threatening.</u> Indeed, <u>a review of all of the language in the supplemental charge fails to show that any of it was coercive or threatening.</u> Absent such, <u>trial counsels' [sic] performance cannot be deficient</u> in failing to move for a mistrial where none was warranted, or objecting where no objection was merited. As a result thereof, the Appellant has failed to show that his trial counsels' [sic] performance was deficient, and this ground is found by the Court to be without merit.

(Emphasis added and citations omitted.)

Brewster appealed to the Court of Criminal Appeals, which affirmed the post-conviction trial court's decision, concluding that its "findings [were] supported by the record on remand, the record of the Rule 32 evidentiary hearing, and the record on direct appeal." (Quotation marks omitted.) The Alabama Supreme Court denied Brewster's petition for a writ of certiorari.

---

[1] The only evidence taken on remand was a short affidavit from the two trial counsel stating that they had advised Brewster of his right to testify at trial, which was relevant to a claim that is not involved in this appeal. Counsel offered the state post-conviction no explanation for failing to move for a mistrial when the jury repeatedly stated that it was deadlocked or for failing to object when the judges kept ordering the jury to continue deliberating.

Brewster then filed this § 2254 petition in federal district court. He again alleged that his trial counsel were ineffective for failing to object or move for a mistrial based on the trial court's multiple instructions to the jury to continue deliberating. His federal claim was worded almost identically to the one he had raised in his state court Rule 32 petition. But this is how the magistrate judge interpreted Brewster's claim: "Brewster next argues that his trial counsel were ineffective for failing to make a motion for a mistrial or for failing to object when the trial court instructed the jury to continue deliberations after the jury informed the court that it was deadlocked." Relying on the Anti-Terrorism and Effective Death Penalty Act's deferential standard of review for claims adjudicated on the merits in state court, and the state court's reasoning that Brewster had failed to cite any coercive or threatening language in "the supplemental charge," the magistrate judge rejected the claim. The district court adopted the magistrate judge's report and recommendation and dismissed Brewster's § 2254 petition.

Brewster appealed and we granted a certificate of appealability on three claims, only two of which are relevant to our resolution of this case:

> Whether the state post-conviction court and the district court misconstrued Brewster's claim — that his trial counsel w[ere] ineffective for failing to object or move for a mistrial when the trial court continued to instruct the jury to deliberate after the jury indicated on three occasions that it was unable to reach a unanimous verdict — as arguing that trial counsel w[ere] ineffective for failing to challenge the language of the Allen instruction as coercive.

11

Whether Brewster's trial counsel w[ere] ineffective for failing to object or move for a mistrial when the trial court repeatedly instructed the jury to continue deliberating, after the jury indicated on three occasions that it was unable to reach a unanimous verdict.[2]

### III.

We review de novo the district court's denial of a habeas petition. McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). Which means we owe no deference to the district court's decision about the state court's decision.

Ordinarily, in a § 2254 case a federal court's decision is narrowly limited by AEDPA, which permits relief on claims adjudicated on the merits in state court only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (quotation marks and citation omitted). "If, however, no state court has adjudicated the merits of a claim that was properly presented, 'federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed de novo.'" Reaves v. Sec'y, Fla.

---

[2] We also granted a COA on whether Brewster's counsel were ineffective for failing to request a jury instruction on mistaken identification. We need not address that issue because the other two are dispositive.

12

Dep't of Corr., 872 F.3d 1137, 1151 (11th Cir. 2017) (alteration in original) (quoting Cone v. Bell, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784 (2009)).

Neither the state post-conviction court nor the state appellate court ruled on the actual claim that Brewster presented to them and is now presenting to us. Instead, they recast his claim as an attack on the language of one of the supplemental instructions (without specifying which of the supplemental instructions they were examining or how they selected that one). The state courts rejected the recast claim after finding that "a review of all of the language in the supplemental charge fails to show that any of it was coercive or threatening."

That may be well and good, as far as it goes, but it does not go far enough to cover Brewster's claim. His claim is that the total force and effect of the two trial judges instructing the jury over and over again that it must keep deliberating after the jury declared over and over again that it was unable to reach a verdict, was coercive. Brewster's claim has never focused exclusively on the particular language of any one of the several supplemental instructions. Instead, his claim has always been based on his attorneys' failure to object or move for a mistrial given the totality of the circumstances involving the jury's inability to reach a unanimous verdict and the judges' reaction to the deadlock. His is a macro claim, not a micro one.

13

Because the claim that we must decide is not a "claim that was adjudicated on the merits in [the] State court proceedings," 28 U.S.C. § 2254(d), we cannot defer to the decisions of the state courts in this case. See Reaves, 872 F.3d at 1151.

IV.

To prevail on his ineffective assistance of counsel claim, Brewster must "demonstrate both that (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" United States v. Webb, 655 F.3d 1238, 1258 (11th Cir. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). We can begin with either of those two components. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order . . . . In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). We'll start with prejudice.

A.

"[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Id. at 693, 104 S. Ct. at 2067. That means "[t]he defendant must

14

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068.

In applying that standard to an attorney's failure to object or move for a mistrial, we ask whether there is a reasonable probability of a different result if counsel had objected or moved for a mistrial.  That, of course, requires at a minimum an error meriting an objection or a mistrial.

How, one might ask, can we ever know if a timely objection would have been sustained and made a difference in the result, or that the mistrial motion would have been granted and thereby avoided the conviction that occurred without it?  The Supreme Court in Strickland provided this guidance:  "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. . . . The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncracies of the particular decisionmaker." Id. at 695, 104 S. Ct. at 2068.  It doesn't matter for prejudice purposes whether the judge at this defendant's trial would have sustained an objection; what counts is whether the judge would have been required to do so

15

under the applicable law and, if so, whether doing so would have resulted in a

reasonable probability of a different result.[3]  The answer is yes, and yes.

A defendant "being tried by a jury is entitled to the uncoerced verdict of that

body."  Lowenfield v. Phelps, 484 U.S. 231, 241, 108 S. Ct. 546, 552 (1988).

Coercion does not mean "simple pressure to agree."  Smith v. United States, 542

A.2d 823, 824 (D.C. 1988).  As one court explained, "such pressure is a natural

function of sending twelve persons into a jury room to deliberate."  Id.  Pressure

becomes coercive when the actions of the court result in "a minority of the

jurors . . . sacrific[ing] their conscientious scruples for the sake of reaching

agreement."  Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962).  While a

_____

[3] And to show prejudice it is usually, but not always, enough that applicable law would have required the trial judge to grant a mistrial if one had been requested.  The "but not always" qualifier is necessary because the reason that the mistrial would have been required must involve constitutional concerns that go to the trial's fundamental fairness and the reliability of the result.  So if, for example, a state law would have required a mistrial but that law does not touch on fundamental rights, cognizable prejudice has not occurred.  See Hammond v. Hall, 586 F.3d 1289, 1339–42 (11th Cir. 2009) (noting that defendant did not show prejudice because, even though he was entitled to a mistrial under state law, that itself did not show that the proceeding produced an unreliable result under Strickland because the state law was based on  pragmatic concerns, not constitutional ones).

As the Supreme Court explained in Lockhart: "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.  To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."  Lockhart v. Fretwell, 506 U.S. 364, 369–70, 113 S. Ct. 838, 842–43 (1993); see Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998) ("In order to demonstrate prejudice, a petitioner must show not only that had counsel acted in a different manner a new trial would have been granted, but also that, as a result of counsel's incompetence, the trial was rendered fundamentally unfair or unreliable.").

trial court may instruct a deadlocked jury to continue deliberating, it "must not coerce any juror to give up an honest belief." United States v. Davis, 779 F.3d 1305, 1312 (11th Cir. 2015); see Showers v. State, 407 So. 2d 169, 171 (Ala. 1981) ("It is quite clear that . . . a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used.").

Our task in a de novo review is to examine the totality of the circumstances to see if the court's actions created a substantial risk that one or more jurors would be coerced into abandoning their honest convictions. See United States v. Woodard, 531 F.3d 1352, 1364 (11th Cir. 2008). The relevant circumstances include: (1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict. See, e.g., Lowenfield, 484 U.S. at 240, 108 S. Ct. at 552 (time between instruction and verdict); Davis, 779 F.3d at 1312–13 (total length of deliberation and number of times a jury reports deadlock); United States v. Brokemond, 959 F.2d 206, 209–10

17

(11th Cir. 1992) (judge's knowledge of jury's split); United States v. Fossler, 597 F.2d 478, 485 (5th Cir. 1979) (number of times jury instructed to continue deliberating); Kesley v. United States, 47 F.2d 453, 453–54 (5th Cir. 1931) (impugning jurors' integrity by accusing them of neglecting their oaths by failing to reach a verdict).

That list is not exhaustive, and the presence of some of the circumstances does not necessarily establish a substantial risk of coercion. It depends on the totality of the circumstances, an assessment of the cumulative effect of everything that went on. See Fossler, 597 F.2d at 485 (We "assess[] the impact of the judge's statements in light of his language and the facts and circumstances which formed their context.").

Starting down the list of relevant circumstances, we note that Brewster's jury deliberated a total of only eleven hours over two days, which is not an inordinate amount of time. The problem, or one of them, is that during those eleven hours of deliberations the jury reported being deadlocked five times — once on the first day and four times on the second.[4]

And the firmness of the deadlock only increased as deliberations continued. The jury's first deadlock note reported that the split was 9 to 3 and "[e]veryone is

---

[4] We are not counting the first note the jury sent out, which simply asked what would happen if one person voted not guilty.

firm in their decision." When asked whether there was "any way this case will be resolved on a unanimous verdict," the foreman answered "no." The second deadlock note reported that the jury "could not reach a unanimous decision" and that one juror "had decided not guilty and no amount of time was going to sway them." The third one reported that "all jurors have decided firmly, eleven guilty, one not guilty, no possibility of resolve." The fourth one stated that the holdout juror was "unwilling to discuss the case." And the fifth one informed the judge that the holdout juror was still refusing to discuss the case and was doing crossword puzzles instead.

After each of the first four deadlock reports, the judge gave the jurors instructions of varying formality requiring them to continue deliberating and try to reach a unanimous verdict. After the fifth and final deadlock report, the judge's action in having all of the reading materials taken out of the jury room sent a strong message to the jury to get back to deliberating. One or two, or even three, instructions requiring a deadlocked jury to keep on deliberating might not be a problem, depending on the surrounding circumstances. But five instructions aimed at breaking a deadlock is a lot (especially, as we will discuss, when the judge knew exactly how the jury was divided).

While "[w]e have never adopted a per se rule against successive Allen charges," Davis, 779 F.3d at 1312, the more times a jury tells the court that it is

19

deadlocked, and the more times the court responds by instructing the jury to continue deliberating, the greater the risk of coercion. In United States v. Fossler, for instance, we concluded that the use of two Allen charges at the defendant's trial coerced a verdict where the jury "indicated at three separate points in time, over a three day period, that it could not reach a decision," and "[o]nly one hour after the second [Allen] charge was sent to the jury, a guilty verdict was returned." 597 F.2d at 485.

The circumstances in this case are more extreme. The jurors faced the cumulative effect of a formal Allen charge, three additional instructions from the court to continue deliberating after the judge knew that there was only one holdout left, and the removal of all reading material from the jury room in direct response to a report that the holdout juror was using that material to keep holding out.

Pressure on jurors, especially on holdout jurors, is increased when the instructions to keep trying to reach unanimity come from a judge who knows how split the jury is and in which direction. That is why the Supreme Court has exercised its supervisory authority to prohibit federal judges from inquiring how deadlocked juries are split. The Court has explained that inquiring about the specifics of the split "serves no useful purpose," tends to be coercive, and "can rarely be resorted to without bringing to bear . . . an improper influence upon the jury." Brasfield v. United States, 272 U.S. 448, 450, 47 S. Ct. 135, 135–36 (1926).

Because it is an exercise of the Court's supervisory authority over the lower federal courts, the Brasfield rule does not apply to state courts (or to state prisoners seeking habeas relief in federal court). See 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States."); Lowenfield, 484 U.S. at 239–40, 108 S. Ct. at 552 (the Brasfield rule applies only to federal courts); Showers, 407 So. 2d at 171 (declining to adopt the Brasfield rule for use in Alabama state courts).

Still, the Supreme Court's prohibiting federal judges from inquiring into the specifics of a jury split underscores the problem with the judge having that knowledge. Lowenfield, 484 U.S. at 240, 108 S. Ct. at 552. The problem exists whether the judge asked for the information or the jury disclosed it without any prompting. If the jury is aware that the court knows it is divided in favor of convicting the defendant, and the court repeatedly instructs the jury to continue deliberating, the jurors in the minority may feel pressured to join the majority in order to placate the judge. See Brasfield, 272 U.S. at 450, 47 S. Ct. at 135–36. That pressure only increases when, as here, the judge is told that the jury is divided 9 to 3 for conviction, and then 11 to 1 for conviction, and later that it is still hung at 11 to 1 for conviction.

21

The judge knew — and the jurors knew that the judge knew — there was but a single holdout standing between a mistrial and a guilty verdict. Everything that happened after the jury sent the second of five deadlock notes with the 11 to 1 breakdown has to be understood in that context. It was as if the judge were saying: "I know [there is one] of you [who is] holding up a verdict; you should stop being so stubborn and fall in line." Smith, 542 A.2d at 825. And that is what the holdout juror finally did. After three more deadlock notes and several additional instructions to keep deliberating, she finally fell in line and voted to convict.[5]

We have also held, for obvious reasons, that "comments, not upon the evidence, but reflecting on the jurors, are not permissible." Kesley, 47 F.2d at 454. In Kesley, the judge admonished the jury that "it is apparent to the court that some of you have forgotten . . . your oaths as jurors. It does not seem to me that there is very much doubt as far as the facts are concerned." Id. at 453. We reversed the resulting conviction and explained that "[n]o juror should be induced to agree to a

---

[5] Disclosure of the specifics of a jury's division by itself would not necessarily be grounds for a mistrial, even in federal court. See United States v. Norton, 867 F.2d 1354, 1365 (11th Cir. 1989) ("[U]nsolicited disclosure of the jury's division by a juror is not by itself a ground for a mistrial."); Sanders v. United States, 415 F.2d 621, 631–32 (5th Cir. 1969) ("The fact that the jury contrary to the instructions of the court volunteered to the court the extent of their division and which way they stood is no reason why the court should be precluded from giving an otherwise proper Allen charge."). But disclosure that a majority of the jurors favor conviction can act as a multiplier of the coercion arising from other circumstances.

22

verdict by a fear that a failure so to agree will be regarded by the public as reflecting upon either his intelligence, or his integrity." Id.

The trial judge may have stepped over that line here and committed Kesley error in the lengthy instruction that he gave in responding to the jury's fourth deadlock note, which informed him that the lone holdout juror had quit discussing the case with the other jurors. In that instruction the judge used the word oath nine times, the last time being when he concluded his charge with this statement: "[Y]ou took an oath. I take mine seriously. I hope you do the same." Though the judge addressed his admonitions to the entire jury, the lone holdout must have felt as though they were aimed at her. It was her vote not to convict, after all, that had led to the lecture to begin with. And the message that was embedded in the charge to take the oath seriously was that doing so would lead to a unanimous verdict.

The final circumstance contributing to our conclusion that the verdict was coerced is how quickly the jury unanimously agreed on a verdict after the court's last instruction and action. A verdict of conviction "bounced out" of the jury room only 34 minutes after the last instruction from the judge (and only 18 minutes after the holdout juror's reading material was taken away). See Lowenfield, 484 U.S. at 240, 108 S. Ct. at 552 ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."); Woodard, 531 F.3d at 1364 ("In assessing whether the charge was

23

coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered, e.g., . . . the amount of time between the delivery of the charge and the return of the jury's verdict."); Fossler, 597 F.2d at 485 (finding coercion where, among other things, "[o]nly one hour after the second Allen charge was sent to the jury, a guilty verdict was returned"); cf. Norton, 867 F.2d at 1364–66 (stating that the jury was not coerced because it "deliberated some four hours after the trial court's supplementary instruction, a time period not suggestive of a coercive or pressure-filled atmosphere").

To be sure, the holdout juror was not threatened with branding or exsanguination, and the jury was not hauled around in a cart. What happened at Brewster's trial would have passed muster in seventeenth-century England, but in twenty-first century Alabama it does not. The coercive circumstances that led to the verdict undermined the fundamental fairness of the trial and the reliability of the verdict. Those circumstances entitled Brewster to a mistrial under Alabama law, and also under federal law. See Orr v. State, 111 So. 2d 639, 640 (Ala. 1959); Jones v. State, 217 So. 3d 947, 952 (Ala. Crim. App. 2016); Gidley v. State, 95 So. 330, 330–31 (Ala. Ct. App. 1923); see also United States v. Amaya, 509 F.2d 8, 9–11 (5th Cir. 1975). The failure of Brewster's counsel to object and to move for a mistrial, as the coercive circumstances piled up, was prejudicial.

24

B.

We turn now to whether Brewster's trial counsel's failure to object and move for a mistrial was deficient performance for Strickland purposes. The standard for effective assistance of counsel is reasonableness, not perfection. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064 ("[T]he proper standard for attorney performance is that of reasonably effective assistance."); Harrington v. Richter, 562 U.S. 86, 110, 131 S. Ct. 770, 791 (2011) ("Strickland does not guarantee perfect representation, only a reasonably competent attorney.") (quotation marks omitted); Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). As we have pointed out, "[t]he reasonableness of a counsel's performance is an objective inquiry." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). "And because counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Id.

Defense counsel, of course, need not make meritless motions or lodge futile objections. Meders v. Warden, Ga. Diagnostic Prison, 900 F.3d 1330, 1349 (11th Cir. 2018) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained."); Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1297

25

(11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). That is not a consideration here because, as our discussion of the prejudice component demonstrates, an objection or motion for mistrial would not have been futile or lacking in merit. We need not decide how early in the chain of coercive circumstances that counsel's failures to object or move for a mistrial became bad enough to be deficient performance for ineffective assistance purposes. The later failures suffice. By the time the jury had declared itself deadlocked for the fifth time and the judge had given his fourth instruction for it to continue deliberating, which included language implicitly criticizing the lone holdout for not giving in, any reasonable attorney would have objected and moved for a mistrial.

It is not ineffective assistance for counsel to fail to make an objection or motion that depends on the future development of the law. See United States v. Ardley, 273 F.3d 991, 993 (11th Cir. 2001); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994). But the law at the time of Brewster's trial made clear that the risk of a coerced verdict was unacceptable. There was no need for clairvoyance.

We recognize that "defense counsel, in defending their client's interests, need not urge every conceivable objection the law would provide." Hubbard v.

26

Haley, 317 F.3d 1245, 1259 (11th Cir. 2003).  The failure to make every valid

objection or pursue every motion that has merit will not necessarily take counsel's

performance "outside the wide range of professionally competent assistance,"

which is the scope of permissible performance.  See Strickland, 466 U.S. at 690,

104 S. Ct. at 2066.  But the fundamental error that Brewster's counsel let go was

one that any reasonable counsel would not have overlooked or thought unworthy

of pursuing.  It was obvious error that unfolded over a period of two days in a

course of action that grew progressively worse.  Counsel had plenty of time to

recognize the error and react.

Of course, counsel can for reasonable strategic reasons refrain from making

a valid objection or moving for relief their client is entitled to if there are

reasonable strategic reasons for not objecting or moving.  See Walls v. Buss, 658

F.3d 1274, 1279 (11th Cir. 2011) ("[W]e have recognized that it can be reasonable

to let incriminating evidence come to the jury's attention."); see also Richter, 562

U.S. at 109, 131 S. Ct. at 790 ("There is a strong presumption that counsel's

attention to certain issues to the exclusion of others reflects trial tactics rather than

sheer neglect.") (quotation marks omitted); Strickland, 466 U.S. at 690, 104 S. Ct.

at 2066 (explaining that strategic choices between plausible options are virtually

unchallengeable); Chandler, 218 F.3d at 1314 ("[A] court must not second-guess

counsel's strategy.").  The standard, again, is whether any competent counsel

27

would have done as defense counsel did and taken, or failed to take, the course of action that counsel took or failed to take.  Chandler, 218 F.3d at 1315.  The answer to that question is not difficult here.

Even before the second judge targeted the lone holdout by having the bailiff confiscate her crossword puzzles, any reasonable attorney would have objected or moved for a mistrial.  By that point there had already been five declarations of deadlock by the jury; four written and oral instructions from two different judges to continue deliberating; the implication by the second judge that by not joining the others the holdout juror was violating her oath; and the periodic disclosures of the jury's numerical breakdown in favor of convicting Brewster.  Things kept getting worse for the defense.  It doesn't take "the pricking of my thumbs" to know that "something wicked this way comes" for a defendant when a jury goes from 9 to 3 for conviction to 11 to 1 for conviction and the lone holdout faces the coercive circumstances that this one did.  Cf. William Shakespeare, The Tragedy of Macbeth, act 4, sc. 1.

As the Second Circuit observed:  "In deciding whether to move for a mistrial when a jury reports deadlock, a defendant acting completely rationally would compare the likely consequences of allowing the jury to deliberate longer with the likely consequences of obtaining a mistrial."  Lane v. Lord, 815 F.2d 876, 879 (2d Cir. 1987).  Here the overwhelmingly likely consequences of the attorneys doing

28

nothing was conviction and the resulting sentence of life without parole, while moving for the mistrial to which their client was entitled would have gotten him a new trial.

It is no answer to invoke some of our general language, as the State does, that "the decision to refrain from asking the court for a mistrial is a tactical decision entrusted to defense counsel." United States v. Burke, 257 F.3d 1321, 1324 (11th Cir. 2001). Tactical decisions need rational reasons behind them. For example, it might be reasonable for an attorney to refrain from objecting or seeking a mistrial early on in the process, or when only one or two signs of coercion are present, or when it looks like the deadlocked jury may be divided in favor of acquittal. See, e.g., Cannon v. State, 806 S.E.2d 584, 589 (Ga. 2017) (defense attorney sought Allen charge before seeking mistrial because, "in his experience, requesting the Allen charge hastens jury deadlock and increases the chance the trial court will grant a mistrial").

One of our decisions provides a concrete example of strategic reasons for not requesting a mistrial. The Hammond case involved an attorney who did not move for a mistrial to which the defendant was entitled under state law based on a prosecutor's inappropriate comment during the sentencing phase of a capital case. See Hammond, 586 F.3d at 1332. We held that the attorney did not perform

29

deficiently even though the defendant would have been given a mistrial of the sentencing stage if he had requested one. Id. at 1335.

We explained in Hammond that a reasonable attorney could have been leery of a mistrial for several reasons, any one of which would have been enough to show that the representation was not deficient. Id. at 1333. First, the defendant in that case was a black man accused of murdering a white woman, and his attorney had managed after five days of extensive voir dire to have a jury selected that consisted of eight black jurors and four white jurors. Id. We noted that "[a]n attorney reasonably could have considered the jury composition favorable and not wanted to risk losing it in a do-over." Id. Second, if a mistrial had been declared, the original jury (which had found Hammond guilty) would have been excused and a new one empaneled to determine only the sentence. The new jury would "be instructed that Hammond had been found guilty and then would be immersed in the horrible details of the crimes he had committed." Id. We concluded that a reasonable attorney might want to avoid that prospect in favor of keeping the original jury because it might have some residual doubts from the guilt phase of the trial. Id. at 1333–34.

Third, we also found that "an attorney could have reasonably believed that a new sentence hearing months in the future would open up for reconsideration some evidentiary rulings that had been made in Hammond's favor." Id. at 1334.

30

Finally, we considered that a reasonable attorney could have relied on the presumption that the jury would disregard the prosecutor's improper remark when it was told to do so by the court and that this was a better option than seeking a mistrial. Id. "In sum," we concluded, "not asking for a mistrial was objectively within the wide range of professionally competent assistance." Id. at 1335 (quotation marks omitted).

In Brewster's case "[t]here is no indication in the record that [counsel's] failure even to raise an objection [or move for a mistrial] . . . was a product of any tactical forethought and we can only speculate as to the reasons for [their] silence." Jackson v. Herring, 42 F.3d 1350, 1360 (11th Cir. 1995) (emphasis omitted). Perhaps they thought that any objection would be meritless. If so, they were really wrong. Or perhaps they didn't see the obvious signs of coercion or didn't know that a coerced verdict was unlawful. We have recognized, after all, that simple ignorance of the law is not always enough for counsel to be ineffective. See Harich v. Dugger, 844 F.2d 1464, 1470 (11th Cir. 1998) (en banc). But that is no answer either. Trial counsel's ignorance of a point of law "that is fundamental to [their] case combined with [their] failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 571 U.S. 263, 274, 134 S. Ct. 1081, 1089 (2014); see Hollis v. Davis, 941 F.2d 1471, 1478 (11th Cir. 1991) ("If [trial counsel] did not assert this right

31

because [they] w[ere] unaware of it, [their] representation was not within the range of competence demanded of attorneys in criminal cases.") (quotation marks omitted).  Brewster's attorneys had plenty of time during the jury's deliberations over two days to research the law if they were unfamiliar with it.

And it ultimately does not matter if trial counsel subjectively thought that the ongoing forced deliberations would somehow turn out well for Brewster.  As we explained in Hammond, counsel's tactical decision must be one that an attorney reasonably could have made.  See Hammond, 586 F.3d at 1332 ("Under the law of this circuit the question is not why [the defendant's] counsel failed to move for a mistrial . . . but whether a competent attorney reasonably could have decided not to move for one.").  As the circumstances got worse, any reasonable attorney would have objected or moved for a mistrial.

It doesn't take a Clarence Darrow to realize that if a jury has gone from 9 to 3 in favor of conviction to 11 to 1 for it, and is complaining about the lone holdout's behavior and her refusal to go along with the others, that jury is not headed toward an acquittal.  See Lane, 815 F.2d at 879.  Unlike in Hammond, there was no conceivable reason, no reasonable strategy, for sitting silent and seeing how things would turn out. The cards had already been dealt, face up, and it was obvious who had the losing hand.  Brewster did not receive the "reasonably

32

effective assistance" of counsel that he was entitled to under <u>Strickland</u>.  466 U.S. at 687, 104 S. Ct. at 2064.

V.

The judgment denying the petition for a writ of habeas corpus is

**REVERSED.**