[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11933
Non-Argument Calendar
_____

D.C. Docket No. 6:16-cv-00844-CEM-LRH


GEORGE C. SNEATHEN,

                                                      Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

                                                      Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 8, 2021)

Before WILLIAM PRYOR, Chief Judge, LAGOA and BRASHER, Circuit Judges.

PER CURIAM:

This appeal returns to us after a remand for the district court to consider whether George Sneathen, a Florida prisoner convicted of sexual battery and of lewd and lascivious molestation of a child less than 12 years old, Fla. Stat. §§ 794.011(2), 800.04(5)(b), was entitled to a writ of habeas corpus because his trial counsel provided ineffective assistance by failing to object when the trial court sent a video recording of his victim's interview to the jury room. *See* 28 U.S.C. § 2254. The district court ruled that counsel performed deficiently, but that Sneathen suffered no prejudice. We affirm.

## I. BACKGROUND

A Florida grand jury returned a four-count amended information against Sneathen. The information charged Sneathen with two counts of sexual battery by having "his penis penetrate or have union with the mouth of [M.G.]" and by having "his penis penetrate or have union with [her] sexual organ," Fla. Stat. § 794.011(2), and with two counts of committing lewd and lascivious molestation by "touch[ing] or fondl[ing] the sexual organ of [M.G.]" and by "forc[ing] or entic[ing] [her] . . . to touch [his] penis," *id.* § 800.04(5)(b). Sneathen pleaded not guilty.

At trial, M.G.'s mother testified that, after her family's home was destroyed in 2004 by Hurricane Charley, they moved into a small trailer located across the street from the home of her oldest daughter, Marissa, and her husband, Sneathen. Mrs. G recalled that M.G. stayed with Marissa at least three nights a week between

January and May of 2005 and that Marissa owned four dogs that she walked every evening. Mrs. G also recalled that M.G. disclosed on her last day of kindergarten that Sneathen had told her to keep secret that he had touched her private parts and that she had touched him. M.G. stated that the abuse occurred while Marissa was caring for her dogs. Mrs. G immediately repeated M.G.'s statements to her husband, he contacted the police, and Deputy Kevin Carroll of the Orange County Sheriff's Office visited the family at their home that evening.

Deputy Carroll recounted his conversation with M.G. who stated that Sneathen took her into his bedroom, pulled down his pants and exposed his penis, and pulled down her pants and touched her with his hand and penis while Marissa cared for her dogs. The deputy asked M.G. how many times the touching occurred, and she said every time she had visited Sneathen's house. M.G. also told the deputy that Sneathen "humped" her and had told her that it was their secret and not to tell anyone.

The next day, Mrs. G called Sneathen and recorded their conversation, which the prosecution played for the jury. Mrs. G asked Sneathen what had happened, and he responded that M.G. was not making up a story. Sneathen stated that, on one occasion, he woke to find M.G. touching him and he instructed her to stop because he was big and she was small. Sneathen also volunteered that M.G. had touched him a couple of times, but he had never touched her. Sneathen told

3

Mrs. G that he woke one time and discovered that M.G. had pulled down his underwear and was attempting to perform fellatio on him, he stopped her, and he told her she could not do that. Sneathen also stated that, when his wife was out of the house, M.G. tried to get on top of him, but he told her not to do so.

That same day, Carrie Ashley of the Department of Children and Families interviewed M.G. privately at home. When Ashley asked M.G. to describe what happened with Sneathen, M.G. began to cry and said she did not want to talk about it. But as Ashley walked out the door, M.G. announced that Sneathen had hurt her in her private area. M.G. pointed to her genitals and stated that Sneathen put his penis inside her while her clothes were off and that it happened 100 times. M.G. also stated that white stuff came out of Sneathen's penis and got on her arm, that he made her suck his penis and that he sucked her private area, and that he told her to keep it a secret.

Deborah Scott, a nurse practitioner, examined M.G. and discovered no physical evidence of sexual abuse. During trial, Scott explained that the absence of internal injury to M.G. did not eliminate the possibility that she had been abused.

M.G. testified that she was seven years old and the highest number she could think of was 100. She stated that she helped Marissa care for and walk her dogs. M.G. recalled that she had been taught about private parts in school and that Sneathen had touched her "front part" with his mouth and his hands, but not with

4

any other part of his body. M.G. stated that she had never seen Sneathen's penis, but she had touched it with her hands more than once while Marissa was out walking the dogs and that Sneathen told her to keep it a secret.

During cross-examination, M.G. stated that she always helped Marissa walk her dogs and that Sneathen never put his finger or penis inside her. M.G. acknowledged that sometimes she had a hard time remembering the truth and that her mom had talked to her a lot about what she should say when she came to court. M.G. clarified during re-direct examination that her mom had told her only to tell the truth. She also stated that Sneathen touched her over her clothes, not under, and his penis touched but did not go inside her mouth. When questioned a second time by defense counsel about her statement that Sneathen never put his penis in her mouth, M.G. responded that she did not know what happened.

Naida Orengo, a case coordinator for the Child Protection Team who had interviewed M.G. in May 2005, authenticated the video recording of their meeting. During the interview, Orengo handed M.G. a drawing of the human body and asked her to name all the body parts. In response to Orengo's questions, M.G. stated that Sneathen had touched her private parts, that he took off her clothes and his clothes, that he touched her "pee-pee" with his "pee-pee" and his finger, that it hurt, and that it happened 100 times. M.G. shrugged her shoulders when asked what Sneathen's penis looked like, but later she stated that he put his penis inside

5

her. M.G. also stated that Sneathen made her touch his penis, but she could not identify what body part that she used to touch him and she did not know if anything came out of his penis after she touched it. During cross-examination, Orengo was unsure whether M.G. understood the quantity of 100 and was surprised that M.G. used the word "penis" when interviewed by Ashley.

Corporal Joe McCollum testified that he arrested and interviewed Sneathen. During the interview, Sneathen stated that M.G. often spent the night at his home and slept between he and his wife "usually wear[ing] underwear or shorts." One evening, he "w[oke] up in the middle of the night with [M.G.] fondling him," he "push[ed] her away," said "you can't do this," and when she asked why, he "said I'm big and you're a small girl." Sneathen also volunteered that "2 nights . . . [M.G.] was fondling me, she had her face around it." When asked if M.G. touched his underclothing, Sneathen answered, "She pulled my shorts down while I was sleeping. And I woke up and pushed her away." Sneathen said he thought M.G. was just a "curious" child, he denied he had "ma[d]e her do something, . . . encourage something," or "touch[ed] her," and he maintained that, although he naturally was aroused, "nothing could possibly happen" because his "wife's laying right there." But Sneathen acknowledged that he never tried to wake his wife or ask her to intervene because he "don't make it an issue" when "little people are curious and stuff." As the interview continued, Sneathen stated that M.G. touched

6

him during "all crazy hours," that she "tr[ied] to peek on [him] while [he] was dressing" and in the bathroom, that she "jump[ed] on top of [him] . . . backwards" while he was lying in bed, that she "tr[ied] to hump [his] leg" while he talked to her mother, and that she "grabbed his hand" while he was sleeping and would "draw [his] hand up her leg or something." When the detective asked about M.G.'s sexual knowledge, Sneathen blamed M.G.'s conduct on "pornography," which he had caught her watching on "Cinemax."

Sneathen rested his case without presenting any evidence. He moved for a judgment of acquittal for the sexual battery of M.G. by attempting or engaging in intercourse. *See* Fla. Stat. § 794.011(2). The trial court granted the motion.

Throughout trial, Sneathen argued in his defense that M.G. had been contaminated by her mother's suggestive influence. Sneathen elicited from Mrs. G during cross-examination that she previously had testified that she talked to M.G. 100 times about the abuse and that her husband objected to how often she broached the topic with M.G. Sneathen also played an excerpt from a deposition M.G. underwent a few weeks before trial during which she said that Sneathen's mouth never touched her "private part" and her mouth never touched his "private part."

During closing statements, Sneathen argued that it was no coincidence that M.G. and her mother reported that she had been abused 100 times. The state argued that M.G.'s testimony was less reliable than her interview, which occurred

7

soon after the abuse and in a more comfortable environment. The state also urged

the jury to discredit Sneathen's statements regarding the incidents.

After the trial court instructed the jury, but before releasing it to deliberate,

the trial court and the parties conferred about sending exhibits to the jury room.

The trial court expressed its "preference . . . to send the evidence and the

mechanism to play them back to the jury . . . [to make its own] decision regarding

whether to play or not play." Neither party objected, and defense counsel

remarked, "I think that's what our boss says is best, that we don't get involved in

that . . . ."

During deliberations, the jury sent the trial court a note requesting to "see

the transcripts of [M.G.'s] in-court entire testimony." With the parties' consent, the

trial court told the jury that it could request to have M.G.'s testimony read back in

open court, but the jury made no such request. About two and a half hours later, the

jury returned verdicts finding Sneathen guilty of sexual battery by having "his

penis penetrate or have union with [M.G.'s] mouth," Fla. Stat. § 794.011(2), and of

the two counts of lewd and lascivious molestation of M.G., *id.* § 800.04(5)(b).

Sneathen unsuccessfully challenged his convictions. He filed a direct appeal,

but the Fifth District Court of Appeal affirmed his convictions summarily.

*Sneathen v. State*, 998 So. 2d 624 (Fla. Dist. Ct. App. 2008). He also filed *pro se* a

motion for state postconviction relief, which the trial court denied. *See* Fla. R.

Crim. P. 3.850. The Fifth District Court of Appeal affirmed the denial of seven of Sneathen's postconviction claims, but it reversed and remanded for consideration of his eighth claim. *Sneathen v. State*, 161 So. 3d 570 (Fla. Dist. Ct. App. 2014). On remand, Sneathen moved to amend his postconviction motion to add a ninth claim that trial counsel was ineffective for failing to object when the trial court sent M.G.'s interview to the jury room, but the trial court did not consider the new claim. The trial court rejected Sneathen's eighth claim, and the appellate court affirmed summarily. *Sneathen v. State*, 215 So. 3d 1247 (Fla. Dist. Ct. App. 2016).

Sneathen filed *pro se* a petition for a writ of habeas corpus in which he challenged trial counsel's failure to object to M.G.'s interview. 28 U.S.C. § 2254. The district court ruled that the claim of ineffective assistance was unexhausted and procedurally defaulted. But we vacated and remanded for the district court to consider Sneathen's claim on its merits. *Sneathen v. Sec'y, Dep't of Corr.*, 787 F. App'x 567 (11th Cir. 2019).

On remand, the district court denied Sneathen's petition. It ruled that counsel performed deficiently by not objecting when the trial court violated state law by sending M.G.'s interview to the jury room, *see Young v. State*, 645 So. 2d 965 (Fla. 1994), but that counsel's conduct did not prejudice Sneathen. The district court determined that it was unlikely that the jury gave undue emphasis to the interview because they declined the offer to have M.G.'s testimony read to them and because

9

Sneathen only speculated that the jury had watched the interview during deliberations. The district court also determined that it was unlikely that the interview affected the jury's verdict because M.G.'s statements focused on Sneathen digitally penetrating and having sex with her, which related to the charge of sexual battery by intercourse that the trial court dismissed. And the district court determined that Sneathen was not prejudiced to the extent that M.G.'s interview related to the charges of sexual battery involving oral sex and of lewd molestation for fondling M.G. because there was ample other evidence to support those convictions, including Sneathen's interrogation, his statement to M.G.'s mother, and testimony from M.G., her mother, and her three interviewers.

Sneathen moved to alter or amend the judgment, which the district court granted in part and denied in part. Fed. R. Civ. P. 52(b), 59(e). The district court denied Sneathen's arguments that he was entitled to an evidentiary hearing and that the judgment failed to address either the effect of the prosecutor's closing argument or the mandate from this Court. The district court granted Sneathen's request to find that M.G.'s interview also related to the charge of lewd molestation for forcing her to touch his penis and explained that its "finding [did] not change [its] disposition" because "there was sufficient evidence, aside from [M.G.'s] interview, on which the jury could base each of its guilty verdicts." The district court also denied Sneathen's request for a certificate of appealability. We granted a

certificate of appealability on the single issue of whether the district court erred in determining that trial counsel was not ineffective for failing to object when the trial court sent M.G.'s interview to the jury room.

## II. STANDARD OF REVIEW

Sneathen's claim of ineffective assistance of trial counsel never "was adjudicated on the merits in [the] State court proceedings." 28 U.S.C. § 2254(d). But because Sneathen provided evidence of cause that excused his procedural default, *see Martinez v. Ryan*, 566 U.S. 1, 14 (2012), the denial of his petition for a writ of habeas corpus is subject to plenary review. *See Brewster v. Hetzel*, 913 F.3d 1042, 1051 (11th Cir. 2019). We review findings of fact for clear error and the application of the law to those facts *de novo*. *Sims v. Singletary*, 155 F.3d 1297, 1304 (11th Cir. 1998).

## III. DISCUSSION

For Sneathen to prevail on his claim of ineffective assistance of counsel, he must prove that his counsel's performance was deficient and that he suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The parties agree that defense counsel performed deficiently by failing to object when the trial court sent M.G.'s interview to the jury room in violation of Florida law. *See Young*, 645 So. 2d 965. But Sneathen also bears the burden of proving that counsel's error "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. In

11

other words, Sneathen cannot obtain a writ of habeas corpus unless his "counsel's conduct so undermined the proper functioning of the adversarial process that [his] trial cannot be relied on as having produced a just result." *Id.* at 686.

The district court did not err. Sneathen failed to establish that the outcome of his trial would have been different if the jury had not had access to M.G.'s interview during their deliberations. *See id.* at 693. The jury had already watched M.G.'s interview during trial. Sneathen's speculation that the jury watched the interview again is insufficient to establish prejudice under *Strickland*. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("offer[ing] only speculation that . . . missing witnesses would have been helpful" does not satisfy "the burden of a habeas corpus petitioner"). And even if the jury watched the interview during its deliberations, we cannot say that affected the outcome of Sneathen's trial given the abundant evidence of his guilt. *See Raheem v. GDCP Warden*, 995 F.3d 895, 935 (11th Cir. 2021) (agreeing state prisoner could not establish prejudice "considering the full record before the jury" containing "overwhelming evidence" of guilt). M.G.'s mother, Deputy Carroll, Ashley, and Orengo testified that M.G. had told each of them that she had touched Sneathen, he had exposed himself to her, and he touched her with his hands and penis. The jury also could have credited M.G.'s incriminating testimony and discredited the statements that Sneathen made to M.G.'s mother and his arresting officer. *See Mamani v. Sanchez Bustamante*,

12

968 F.3d 1216, 1230 (11th Cir. 2020) ("It is for the jury—not for us or the district court—'to weigh conflicting evidence and inferences, and determine the credibility of witnesses.'"). The district court reasonably concluded that Sneathen was not prejudiced by his counsel's allegedly deficient performance.

Sneathen argues in his reply brief that the district court erred by denying him an evidentiary hearing, but our review is limited to the issues delineated in the certificate of appealability. *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010). Sneathen's argument is outside the scope of the certificate.

## IV. CONCLUSION

We **AFFIRM** the denial of Sneathen's petition for a writ of habeas corpus.