[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-11189

_____

ARTURO RUBINSTEIN,
individually,
FAB ROCK INVESTMENTS, LLC,
a Nevada limited liability company,
OCEANSIDE MILE, LLC,
a Florida limited liability company,

Plaintiffs-Appellees
-Cross Appellants,

versus

YORAM YEHUDA,
SHARONA YEHUDA,
THE KESHET INTER VIVOS TRUST,

Defendants-Appellants
-Cross Appellees,

KARIN YEHUDA, et al.,

Defendants.

————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:17-cv-61019-KMW

————————————

Before WILSON, ROSENBAUM, Circuit Judges, and CONWAY,* District Judge.

WILSON, Circuit Judge:

For many years, Arturo Rubinstein was a close friend to Yoram and Sharona Yehuda. So when the Yehudas found themselves in financial trouble, they turned to Rubinstein for help. The Yehudas' trouble was this. Through a family trust, they held the majority stake in an LLC that owned a beachfront hotel. The LLC had fallen behind on repaying a bank loan, and the loan was soon

---

* Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

coming due.  With the threat of bankruptcy and foreclosure on the hotel looming, the Yehudas and Rubinstein worked out a handshake deal.  Rubinstein agreed to help the LLC obtain financing, and the Yehudas agreed to assign Rubinstein and his company their majority stake in the LLC.

The question is: what did that assignment entail?  The parties told two different stories following the assignment.  The Yehudas said that they had agreed to assign Rubinstein a *temporary* interest in the LLC, and that he had agreed to return that interest after he helped obtain financing.  Rubinstein insisted that the Yehudas had agreed to assign a *permanent* interest in the LLC.  While a dispute about the permanency of the assigned interest festered, the Yehudas took matters into their own hands.  Holding themselves out as owners of the hotel, they sold the property and distributed the proceeds to themselves and their investors.  Rubinstein soon learned of the sale and filed suit.

After years of litigation and a two-week trial, the jury mostly accepted Rubinstein's version of events.  They awarded him a four-million-dollar verdict on claims of fraud and conversion, which they reduced by a half million dollars for his failure to mitigate damages.  The Yehudas now seek to vacate that verdict, arguing that the district court lacked subject matter jurisdiction.  We reject that argument.  Though the only federal claim in this case, a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim, was dismissed at the pleading stage, it was substantial enough to invoke the district court's jurisdiction.  And that federal

jurisdictional hook empowered the court to continue exercising supplemental jurisdiction over related state law claims.

The Yehudas also complain that the jury's $2.5 million punitive damages award was excessive, that the district court coerced the jury, and that the jury relied on improper expert testimony. Upon review, none of these arguments warrant reversal. Finally, Rubinstein cross-appeals the reduction of damages for failure to mitigate. We reverse on that issue because there was no evidence that any inaction on Rubinstein's part increased the amount of damages suffered.

## I.    Background

### A.    Factual Background

The origins of this case trace back to 2006. At that time, the Yehudas were looking to buy the Seabonay Beach Resort, a beachfront hotel in Broward County, Florida. They planned to renovate and operate the hotel. For that purpose, they formed Oceanside Mile LLC, which we'll refer to as "Oceanside." Through Oceanside, the Yehudas purchased the hotel property in 2007 for $10.5 million.

The Yehudas transferred their interest in Oceanside to a family trust, which we'll call "the Trust." To help fund the hotel purchase, the Trust sold part of its equity in Oceanside, but kept a 50.5% majority stake. The Yehudas also contributed $3 million of their own money to buy the hotel, and they took out a $6.5 million loan which they personally guaranteed and which was secured by

a mortgage against the hotel.  That loan was later assigned to First Citizens Bank.

The Yehudas managed and operated the hotel for the next several years, but in 2013 they encountered a problem.  The First Citizens loan was nearing maturity, and Oceanside could not pay.  Making matters worse, Oceanside could not refinance the loan because the Yehudas had poor credit and no longer qualified as guarantors.  In need of help, the Yehudas cut a deal with their friend, Rubinstein, under which the Trust would assign its 50.5% interest in Oceanside to Rubinstein's company, Fab Rock.  The understanding was that Rubinstein would obtain financing and help solve Oceanside's financial problems.  The Trust promptly made the assignment to Fab Rock and named Fab Rock the managing member of Oceanside.

The agreement, however, was never reduced to writing, and the parties have disputed the nature of the assignment.  According to Rubinstein, the assignment was permanent.  He offers at least two reasons why the Yehudas agreed to such a deal.  First, the deal allowed them to continue to work as managers of the hotel and to earn management fees from doing so.  Second, the Yehudas were worried about becoming the target of a lawsuit from Oceanside's minority owners who stood to lose their investment if First Citizens foreclosed on the hotel.  By parting with their interest in Oceanside, the Yehudas escaped that predicament.  Of course, the Yehudas tell a different story: that the assignment was temporary and for the limited purpose of refinancing the First Citizens

loan.  They say that Rubinstein was to return his 50.5% interest in Oceanside as soon as a new loan was secured.  On this version of events, Rubinstein came to the Yehudas' aid because he owed them a favor.

In any event, the assignment took place in September 2013, just a month before the First Citizens loan was set to mature.  As the deadline approached, negotiations between Oceanside and First Citizens stalemated.  Three days before the loan came due, Oceanside filed for Chapter 11 bankruptcy, and First Citizens sued the Yehudas shortly after for breach of their guarantees.  In the bankruptcy proceedings, Rubinstein paid hundreds of thousands of dollars in legal fees, and he attended bankruptcy hearings with the Yehudas.  The Yehudas' testimony at some of these bankruptcy hearings was notable.  For example, Sharona Yehuda stated under oath that she and her husband had transferred ownership of Oceanside to Fab Rock.  And Yoram Yehuda testified at his deposition that the Yehudas had assigned their interest in Oceanside to Fab Rock without any agreement for Fab Rock to return that interest.

After about a year, the bankruptcy proceedings ended when Oceanside secured a $5.2 million loan from Stonegate Bank.  Rubinstein and two of Oceanside's minority members personally guaranteed the Stonegate loan, which infused enough cash to pay off all but $1 million of the First Citizens loan.  To help cover the balance, Rubinstein contributed $500,000.  Oceanside's minority

owners helped pay off the rest.  At that point, First Citizens, having been fully repaid, dismissed its lawsuit against the Yehudas.

It was not long, though, before controversy arose between the Yehudas and Rubinstein.  Central to the controversy were two documents executed in December 2015: an agreement, and a modification to the agreement, purporting to transfer Fab Rock's ownership in Oceanside back to the Yehudas for no consideration. While the documents appeared to bear Rubinstein's signatures, Rubinstein insisted that the Yehudas had forged the signatures in an effort to seize control of Oceanside.

Meanwhile, the Yehudas created an LLC called Fabrock One—named nearly identically to Rubinstein's Fab Rock—and appointed their daughter manager of the company.  Sharona Yehuda then called Oceanside's accountant and informed him that Fab Rock's tax identification number and address had changed.  But rather than give the information for Fab Rock, she gave the information for the newly created Fabrock One.  The Yehudas also opened new bank accounts without Rubinstein's knowledge and moved Oceanside's money into those accounts.  The reason for opening these accounts, Rubinstein says, was to divert Oceanside's sales proceeds to accounts the Yehudas controlled.

Around the same time, in late 2015, the parties began filing competing annual reports with the State of Florida.  Sharona Yehuda filed reports listing herself as Oceanside's manager.  Rubinstein countered with amended reports listing Oceanside's manager as himself or Fab Rock.  These back-and-forth filings continued

through December 2015.  Sharona Yehuda continued to submit filings after that time, but Rubinstein tried a different tack.  In June 2016, he directed the Yehudas to relinquish their role as hotel managers.  When they refused, he sued in California, where the Yehudas resided.  Among other things, Rubinstein sought to remove the Yehudas as managers of the hotel.

While the California action was pending, the Yehudas began negotiating a sale of the hotel—apparently without Rubinstein's knowledge.  In December 2016, they executed a contract to sell the hotel for $13.5 million.  When the buyers, conducting due diligence, asked who Rubinstein was, the Yehudas said he was merely a "front man" on a loan.  At the closing, Sharona Yehuda signed over the deed along with an owner's affidavit stating under penalty of perjury that no one else had an interest in the hotel and that Oceanside was not involved in ongoing litigation.  The Yehudas received just over $4 million in sale proceeds, with the rest going to Oceanside's minority members.  None of the proceeds went to Rubinstein.

20-11189                Opinion of the Court                9

### B.    Procedural Background

#### 1.    Pretrial Proceedings

In 2017, Rubinstein, Fab Rock, and Oceanside filed this action in federal court against the Yehudas and the Trust.[1]  To simplify, we often refer to the plaintiffs collectively as "Rubinstein," and to the defendants—Yoram Yehuda, Sharona Yehuda, and the Trust—as "the Yehudas."

In a second amended complaint, Rubinstein alleged a federal RICO violation, along with a host of state law claims.  Three of Rubinstein's claims are relevant to this appeal.  First, in his federal RICO claim, Rubinstein alleged that between 2007 and 2017 the Yehudas engaged in a pattern of racketeering activity involving mail fraud and money laundering.  Second, in a common law fraud claim, he alleged that the Yehudas falsely represented that they would permanently assign their interest in Oceanside, despite intending all along to retake that interest.  Third, in a conversion claim, he alleged that the Yehudas unlawfully converted his interest in Oceanside and the net proceeds from the hotel sale.

The Yehudas moved to dismiss the complaint for failure to state a claim.  They added that dismissal of the federal RICO count would strip the court of jurisdiction.  After Rubinstein filed a

---

[1] Additional defendants in this action were: Oceanside's minority owners, the buyers of the hotel, and Stonegate Bank.  In this appeal, our focus is narrowed to the claims against the Yehudas.

response, the Yehudas included in their reply a line stating: "With the absence of adequately alleged predicate acts, the RICO claim fails, and so too goes this Court's jurisdiction and the entire action should be properly remanded to state court. *See* SAC ¶ 1; 28 U.S.C. § 1367(c)(3)."

In October 2018, the magistrate judge recommended dismissal of the federal RICO claim and several of the state law claims. The magistrate judge found that the federal RICO claim failed for a couple reasons. "[M]ost glaring[ly]," the complaint did not identify a *pattern* of racketeering. Instead, it relied on a single event: the sale of the hotel. The magistrate judge also found that Rubinstein's allegations of predicate racketeering acts were too conclusory even under normal pleading standards, and much too conclusory under the heightened Rule 9(b) standard that applies to civil RICO claims. "[A]t bottom," the magistrate judge found, this was "a fraud by forgery case." The district court, adopting the magistrate judge's report and recommendation, dismissed the federal RICO claim and some of the state law claims. Rubinstein's fraud and conversion claims survived.

Neither the magistrate judge nor the district court addressed subject matter jurisdiction. And after the district court's ruling, the Yehudas did not move to dismiss the action based on lack of subject matter jurisdiction. Nor did the issue of jurisdiction often arise in the litigation that followed. One of the few times the issue arose, during a December 2018 discovery hearing, the magistrate judge seemed under the impression that the case was proceeding in

federal court based on diversity jurisdiction. Rubenstein's counsel clarified that the court had supplemental jurisdiction, and the Yehudas' counsel agreed that there was "possible supplemental jurisdiction" which the court could exercise "in its discretion." The issue next arose in February 2019, albeit briefly, when the Yehudas filed an amended answer to Rubinstein's second amended complaint. They denied subject matter jurisdiction, stating that the dismissal of the federal RICO claim divested the court of jurisdiction.

But several weeks before trial, in July 2019, the parties stipulated that the court had jurisdiction. The stipulation provided: "There are compelling reasons for the Court to continue to exercise supplemental jurisdiction . . . [g]iven the amount of judicial time that has been expended . . . and the overall passage of time involved."

## 2.     Trial and Posttrial Proceedings

Trial began on July 29, 2019 and lasted two weeks. On the fifth day of trial, Rubinstein moved to qualify an expert witness to testify about whether the signatures on the agreement and modification documents were forged. The Yehudas objected, arguing that he was not qualified to testify as an expert in document examination. After hearing argument on the witness's qualifications, the district court stated: "I will not recognize him as an expert; I will recognize that [Rubinstein is] calling him as an expert. If he testifies he had better stay in a very narrow lane." Then, over a break, the district court reviewed the witness's history of testimony in past cases. After its review, the court concluded that, although the

witness's credentials were "thin," he would be allowed to testify on the condition that he did not misrepresent his qualifications to the jury. The witness then testified that, in his opinion, Rubinstein did not sign the agreement and modification.

After the parties presented their cases, the court instructed the jury. Over Rubinstein's objection, the court instructed that the jury should reduce the damages award if it found that Rubinstein failed to mitigate his damages. The Yehudas' theory was that Rubinstein knew ownership of the hotel was contested by late 2015, and that if he had taken action—perhaps by filing statements of authority with the State of Florida in 2016 and 2017—he could have prevented the sale of the hotel.

The jurors began deliberating the morning of August 12. By around 5 p.m., they had a question: Did each juror have to reach the same answer? The court responded that the verdict had to be unanimous. The next day, the jurors sent another note stating that they could not reach an agreement. Two more notes soon followed, reporting that Juror 2 had health concerns and that Juror 3 had work scheduling issues. The court called the jury to the courtroom and expressed that it was "aware of the situations" the jury had reported. Acknowledging the "difficult task" at hand, the court excused the jurors for the rest of the day.

On the third day of deliberations, the court discussed with counsel the possibility of giving the Eleventh Circuit pattern civil

*Allen*[2] charge.  An *Allen* charge is an instruction given by a trial judge when a jury is having trouble reaching a verdict.  It has often been called a "dynamite" charge for its potential to "blast loose a deadlocked jury."  *Green v. United States*, 309 F.2d 852, 854 (5th Cir. 1962).  The Yehudas objected.  They argued that the instruction would pressure jurors in the minority to abandon their honestly held beliefs.  Nonetheless, the district court advised that, if needed, it would give the pattern *Allen* charge.  Later that day, the jury sent yet another note.  This one stated: "[W]e cannot come to a unanimous decision after deliberating for two days.  People on this jury are saying they do not see any evidence to change their mind.  Please advise on how to move forward."

The district court then gave the pattern *Allen* charge which provided in full:

> Members of the jury: I am going to ask that you continue your deliberations to reach a verdict, and I want you to consider the following comments.  This is an important case, and the trial has been expensive in terms of time, effort, money, and emotional strain to both the plaintiffs and the defendants.  If you fail to agree on a verdict, the case remains open and may have to be tried again.  A second trial would be costly to both sides, and there's no reason to believe either side can try it again better or more

---

[2] *Allen v. United States*, 164 U.S. 492 (1896).

exhaustively than they have tried it before you. Any future jury is going to be selected in the same manner and from the same source as you. There is no reason to believe that the case could ever be submitted to a jury of people more conscientious, more impartial, or more competent to decide it, or that either side could produce more or clearer evidence. It's your duty to consult with one another and to deliberate with a view to reaching an agreement if you can do it without violating your individual judgment. Again, you must not give up your honest beliefs about the evidence['s] weight or [ ] effect solely because of other jurors' opinions or just to reach a verdict. You must decide the case for yourself, but only after you consider the evidence with your fellow jurors.

So you shouldn't hesitate to reexamine your own views and change your opinion if you become convinced it's wrong. To bring your minds to a unanimous result[,] you must openly and frankly examine the questions submitted to you with proper regard for the opinions of others with a willingness to reexamine your own views. If a substantial majority of you are for a verdict for one party[,] each of you who holds a different position ought to consider whether your position is reasonable. It might not be reasonable since it makes so little impression on the minds of

your fellow jurors who bear the same responsibility, serve under the same oath[,] and have heard the same evidence. Now you may conduct your deliberations as you choose. But I suggest that you now carefully reexamine and reconsider all the evidence in light of the further instructions to you on the law. Again, considering all of the instructions as a whole, and you may take all the time you need. Again, I remind you, you must consider all of the instructions as a whole. You shouldn't single out any part of any instruction, including this one, and ignore others. And I now ask you to return to the jury room and continue your deliberations.

Deliberations resumed the next morning and by 1:30 p.m. the jury had reached a verdict. The jury found that (1) Sharona Yehuda and the Trust (but not Yoram Yehuda) were liable for common law fraud; and (2) Sharona Yehuda, Yoram Yehuda, and the Trust were liable for conversion. The jury awarded $1.5 million in compensatory damages, from which it subtracted $500,000 for Rubinstein's failure to mitigate damages. It awarded $2.5 million in punitive damages.

The Yehudas filed a notice of appeal. Fifteen days later, Rubinstein filed a cross-appeal, arguing that the district court should not have allowed the Yehudas' failure-to-mitigate defense.

## II.    Standard of Review

We review the district court's subject matter jurisdiction de novo. *Milan Exp., Inc. v. Averitt Exp., Inc.*, 208 F.3d 975, 978 (11th Cir. 2000). The constitutionality of a punitive damages award is also reviewed de novo. *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 744 (11th Cir. 2020). We review for abuse of discretion the district court's decision to give a jury instruction, including an *Allen* charge, *Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068, 1086–87 (11th Cir. 2018), and we apply the same standard to a district court's decision to allow expert testimony, *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).

## III.    Discussion

Our discussion breaks into three parts. In Part A, we examine the district court's subject matter jurisdiction. In Part B, we consider the Yehudas' contentions that: (1) the district court erred in giving the *Allen* charge, (2) the district court erred in allowing Rubinstein's expert witness to testify, and (3) the punitive damages award should be remitted. Finally, in Part C, we address Rubinstein's cross-appeal.

### A.    Subject Matter Jurisdiction

This case proceeded in federal court based on supplemental jurisdiction. The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides in relevant part:

(a) Except as provided in subsections (b) and (c) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

. . .

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

. . .

(3) the district court has dismissed all claims over which it has original jurisdiction . . . .

28 U.S.C. § 1367.

We have explained that subsections (a) and (c) reflect a "dichotomy." *Lucero v. Trosch*, 121 F.3d 591, 597 (11th Cir. 1997). "Subsection (a) . . . establishes the district court's *power* to exercise supplemental jurisdiction over all supplemental claims which form part of the same 'case or controversy' under Article III of the Constitution." *Id.* Under this subsection, federal courts can exercise supplemental jurisdiction over state claims only when a substantial federal claim is pleaded in the complaint. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). Because § 1367(a) implicates Article III's case or controversy requirement, *Lucero*, 121 F.3d at 598, it is not subject to waiver by the parties.

Subsection (c) then gives the district court *discretion* to decline supplemental jurisdiction in some circumstances, including when the district court has dismissed all the federal claims, and only state claims remain in the action. *Id.* Because this subsection does not implicate Article III's case or controversy requirement, it is subject to waiver and forfeiture. *See id.* A party must put the issue before the district court if it wants the court to exercise its discretion to decline jurisdiction. *Id.*

The Yehudas' challenge to the district court's jurisdiction tracks this dichotomy. First, they argue that this case never presented a federal question sufficient to confer jurisdiction under § 1367(a) because the RICO claim was a farce, designed to get Rubinstein's state law claims into federal court. Second, they argue that even if the federal RICO claim arose under federal law, the district court should have exercised its discretion under § 1367(c) to dismiss the state law claims once the federal RICO claim had been dismissed. We address those two contentions in turn.

### 1.    Substantiality of the Federal Claim

Not every complaint alleging a federal claim invokes federal question jurisdiction. *See Bell v. Hood*, 327 U.S. 678, 682–83 (1946). A federal claim fails to invoke federal jurisdiction where it is either "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous."[3] *Id.* A claim

---

[3] The notion from *Bell* that we can distinguish "frivolous" claims from those that simply fail on the merits has received its share of criticism. Four decades

is insubstantial and frivolous if it is "obviously without merit" or clearly foreclosed by Supreme Court precedent. *Hagans v. Lavine*, 415 U.S. 528, 537 (1974). Under this onerous standard, "the category of claims that are 'wholly insubstantial and frivolous' is exceedingly narrow." *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1034 (11th Cir. 2022). The Yehudas argue that Rubinstein's federal RICO claim is in this narrow category of cases. They say it falls far short of pleading the required RICO elements and is obviously devoid of merit.

A civil RICO claim requires a pattern of racketeering activity, which is established by "at least two distinct but related predicate acts." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292 (11th Cir. 2010) (internal quotation marks omitted). Rubinstein alleged a pattern of racketeering based on two predicate acts: mail fraud and money laundering.

As to mail fraud, Rubinstein alleged that the Yehudas "[e]ngag[ed] in a scheme to defraud third parties and us[ed] the

---

ago, then-Justice Rehnquist attempted, unsuccessfully, to persuade the Court to reconsider *Bell*. He argued that *Bell* blurred the line between merits and jurisdictional deficiencies, had no basis in the Federal Rules of Civil Procedure, and created a difficult line-drawing problem for courts. *See Yazoo Cnty. Indus. Dev. Corp. v. Suthoff*, 454 U.S. 1157, 1160 (1982) (Rehnquist, J., dissenting from the denial of certiorari). One of our colleagues recently built upon that criticism and invited the Supreme Court to revisit the doctrine. *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1040–42 (11th Cir. 2022) (Newsom, J., concurring). But for now, of course, we remain bound by the Court's teaching in *Bell*.

United States mail to execute this scheme in violation of 18 U.S.C. § 1341 as alleged in paragraphs 38, 40, and 54[.]"  The cross-referenced paragraphs alleged that:

- Sharona Yehuda "fed Oceanside's accountant false information so that he would file a tax return with Fab Rock One's information in place of Fab Rock's, and in fact he did so through the United States mail."

- The Yehudas "falsely made, altered, forged or counterfeited several Annual Reports and other official documentation by United States mail."

- The Yehudas filed fraudulent annual reports via mail on October 22, 2015, November 24, 2015, February 9, 2016, and January 13, 2017.

- The Yehudas filed a fraudulent amendment to Oceanside's Articles of Organization via United States mail on or about April 26, 2017.

Attached to the complaint were exhibits supporting these allegations.

As to money laundering, Rubinstein alleged that the Yehudas engaged in a monetary transaction in property derived from the unlawful sale of the hotel.  Elsewhere in the complaint, Rubinstein alleged that after the Yehudas sold the hotel for $13.5 million, they "drained Oceanside's bank accounts, distributing the monies to themselves, to some of the members of Oceanside, and to

unrelated third parties," paying none of the proceeds to Fab Rock or Rubinstein.

The magistrate judge focused on two flaws in the RICO allegations. First, they did not establish a pattern of racketeering. The magistrate judge reasoned that the Yehudas' repeated filing of fraudulent business records, the sale of the hotel, and the disbursements of the sale proceeds all reduced to a single scheme and a singular purpose: to sell the hotel and deprive Rubinstein and Fab Rock of the proceeds. The second flaw was that Rubinstein's allegations of mail fraud and money laundering were conclusory. For example, Rubinstein dedicated just one paragraph of his complaint to money laundering allegations, and that paragraph had little substance. It "merely direct[ed] the Court to review other portions of the [complaint] to figure out the nature of [the] allegations." Based on these flaws, the Yehudas argue that Rubinstein's RICO claim was obviously meritless.

For support, they point to a pair of Seventh Circuit cases in which federal RICO allegations fell so flat that they failed to invoke the jurisdiction of a federal court. In the first case, *Williams v. Aztar Indiana Gaming Corp.*, a compulsive gambler sued a casino under the federal RICO statute. 351 F.3d 294, 296 (7th Cir. 2003). To establish the required predicate racketeering activity, he argued that the casino had committed mail fraud by sending him misleading promotional materials. *Id.* at 299. The plaintiff came nowhere near stating a claim because the casino's communications were not misrepresentations, much less ones that the plaintiff could have

relied on. *Id.* And in fact, plaintiff's counsel "all but conceded" at oral argument "that he lacked a good faith basis for bringing the RICO claim." *Id.* at 300. The Seventh Circuit, seeing through the plaintiff's gamesmanship, held that the claim was "*so* feeble, so transparent an attempt to move a state-law dispute to federal court" that it did not invoke federal jurisdiction. *Id.* at 299 (internal quotation marks omitted).

The second case the Yehudas analogize to is *Oak Park Trust and Savings Bank v. Therkildsen*, 209 F.3d 648 (7th Cir. 2000). The RICO claim in that case was based on a developer's false promise to a potential buyer that a community would be private and gated. *Id.* at 651. At best, the court reasoned, the potential buyer had a breach of contract claim which could not serve as the predicate for a RICO claim. *Id.* And even if the plaintiff's claim could be viewed as alleging fraud, it alleged only a single instance of fraud and thus could not show a pattern of racketeering. *Id.*

There is significant daylight, however, between this case and those Seventh Circuit cases. It was evident in *Aztar*—and plaintiff's counsel "all but conceded"—that the RICO claim was a ploy to manufacture federal jurisdiction. And in both *Aztar* and *Therkildsen*, the plaintiffs alleged nothing even approaching a pattern of racketeering. Rubinstein's RICO claim, though it misses the mark, at least comes closer to its target.

Here's why. A pattern of racketeering can be established when a defendant commits a predicate act of racketeering and launders the proceeds derived from that initial predicate act. *United*

*States v. Godwin*, 765 F.3d 1306, 1322 (11th Cir. 2014). In *Godwin*, for example, the government proved a pattern of racketeering by showing that the defendant (1) participated in a home invasion robbery, and (2) engaged in money laundering by conducting a financial transaction involving the proceeds of that robbery. *Id.* In similar fashion, Rubinstein could have alleged that the Yehudas engaged in a pattern of racketeering by (1) committing mail fraud to induce the sale of the hotel, and (2) laundering the proceeds of that sale.

To be sure, the RICO count was properly dismissed because Rubinstein failed to plead the claim with the specificity required for fraud allegations. The paragraph of the complaint alleging money laundering, for example, does not specify any financial transaction other than the sale of the hotel. Moreover, the complaint's scattered references to the Yehudas "drain[ing] [ ] bank accounts" and "distributing [ ] monies to themselves" are vague and not clearly incorporated into the money laundering allegations. These shortcomings, however, do not place Rubinstein's claim in the extreme category of cases so frivolous that they fail to invoke the court's jurisdiction. His claim is of the more common variety that fail on the merits. Therefore, we find that the RICO claim was substantial enough to confer subject matter jurisdiction.

## 2.    District Court's Discretion to Exercise Supplemental Jurisdiction

We turn, then, to the second part of our supplemental jurisdiction analysis. Even if the RICO claim invoked federal

jurisdiction, should the district court have dismissed the state law claims once it had dismissed the RICO claim?  The Yehudas say it should have.  Rubinstein counters that the Yehudas waived any objections to supplemental jurisdiction.

Waiver is the "intentional relinquishment or abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotations marks omitted).  A party can waive an issue by making only a passing reference to it and failing "to make arguments and cite authorities in support of [the] issue."  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012).  With that standard in mind, we conclude that waiver occurred here.  The Yehudas cited § 1367(c) only a single time in their motion to dismiss reply, and they did not develop any argument under that subsection.  Nor did they file any motion to put the issue before the court after the federal RICO claim was dismissed.  Moreover, by stipulating that the exhaustion of "extensive judicial resources" on the case was a "compelling reason[ ]" for the district court to continue exercising jurisdiction over state law claims, the Yehudas relinquished any right to have the district court decline to exercise supplemental jurisdiction over the remaining state law claims.  *See Olano*, 507 U.S. at 733.  Because the argument is waived, we will not entertain it on appeal.

To recap, Rubinstein's federal civil RICO claim was not so obviously frivolous that it failed to invoke federal jurisdiction.  And although the district court could have declined to continue exercising jurisdiction once the federal RICO claim was dismissed, the

parties consented to litigating the remaining state law claims in federal court. As a result, the Yehudas cannot argue on appeal that the district court abused its discretion by declining to dismiss the case. We can therefore proceed to the merits of the appeal.

### B.    Trial Errors Raised on Appeal

The Yehudas argue that even if the district court had jurisdiction, we should reverse and remand for a new trial based on any of three errors.

### 1.    The *Allen* Charge

The Yehudas' first contention is that the district court's *Allen* charge coerced the jury to reach a verdict. Over the years, several judges on our court and its predecessor, the old Fifth Circuit, have sharply criticized the practice of giving *Allen* charges, worrying that jurors in the minority will feel pressure to conform to the majority view. *See United States v. Rey*, 811 F.2d 1453, 1460 (11th Cir. 1987); *Andrews v. United States*, 309 F.2d 127, 129–30 (5th Cir. 1962) (Wisdom, J., dissenting). Still, our precedent condones the practice as long as the district court does not "coerce any juror to give up an honest belief." *United States v. Anderson*, 1 F.4th 1244, 1269 (11th Cir. 2021) (internal quotation marks omitted). Whether an *Allen* charge is coercive depends on two things: "the language of the charge and the totality of the circumstances under which it was delivered." *Id.* When considering whether an *Allen* charge was coercive, we are mindful that "[a] district judge, watching the jurors file back into the courtroom and looking them in the eye,

can make a better judgment . . . than an appellate court reading the cold record." *United States v. Davis*, 779 F.3d 1305, 1314 (11th Cir. 2015).

The Yehudas attack the *Allen* charge from two angles. First, they say that the language of the *Allen* charge was coercive. They take particular exception to the court telling the jury that a retrial would be costly. We are unpersuaded by this argument. The *Allen* charge read to the jury matched the pattern Eleventh Circuit instruction. We approved of materially identical language only a few years ago, *see Burkhart*, 884 F.3d at 1085 n.5, and we are thus bound to do the same here.

Second, the Yehudas argue that the *Allen* charge was coercive given the totality of the circumstances. We have identified five circumstances relevant to this analysis, though the list is not exhaustive:

> (1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict.

*Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019). The parties agree that these are the right circumstances to analyze, but they disagree about whether the totality of these circumstances compels a finding that the jury was coerced.

Starting with the first two relevant circumstances, the Yehudas emphasize that deliberations lasted four days and that the jury reported being deadlocked three times. We disagree that those circumstances weigh in the Yehudas' favor. While four days of deliberation is a relatively long time, it is not alarmingly so in the context of a complex, two-week trial. Neither is the number of times the jury deadlocked especially high. In *Brewster*, where the jury reported being deadlocked five times, we observed that "[o]ne or two, or even three, instructions requiring a deadlocked jury to keep on deliberating might not be a problem, depending on the surrounding circumstances." *Id.* at 1054.

And here, the other surrounding circumstances weigh toward the instruction being proper. Particularly significant is that the judge did not know of the jury's numerical split when instructing the jury to keep deliberating. *See id.* ("Pressure on jurors, especially on holdout jurors, is increased when the instructions to keep trying to reach unanimity come from a judge who knows how split the jury is and in which direction."). The *Allen* charge in *Brewster* was particularly problematic because it was no secret that there was one holdout juror. As a result, each time the judge told the jury to keep an open mind and consider the views of fellow jurors, he was, in effect, speaking directly to one juror and

pressuring her to fall in line. *Id.* at 1055. In contrast here, the judge never knew the split. For all the judge knew, the split might have been 6-6, or might have favored either party. Because the *Allen* charge did not target a single juror, the risk of coercion was diminished.

The last two circumstances point in the same direction. The district court never implied that the jurors would violate their oaths by failing to reach a verdict. *But see id.* at 1049 (disapproving of the judge using the word "oath" nine times, admonishing the jury: "[Y]ou took an oath. I take mine seriously. I hope you do the same."). And finally, the time the jury spent deliberating after the *Allen* charge—about three hours—is not necessarily indicative of coercion under our precedents. *See United States v. Chigbo*, 38 F.3d 543, 545–46 (11th Cir. 1994) (per curiam) (finding that fifteen minutes of deliberation between the *Allen* charge and the verdict did not indicate coercion); *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989) (finding that four hours of deliberation between the *Allen* charge and the verdict was "not suggestive of a coercive or pressure-filled atmosphere"); *United States v. Scruggs*, 583 F.2d 238, 239–41 (5th Cir. 1978) (finding no coercion when the jury deliberated for 48 minutes between the *Allen* charge and the verdict).

Altogether, the totality of the circumstances does not indicate that the district court abused its discretion by giving the *Allen* charge. We thus affirm on this issue.

### 2.    Expert Witness's Qualification

The Yehudas argue next that the district court erred by allowing testimony from Rubinstein's forensic document expert. They argue that he was not qualified to testify.[4]

At bottom, decisions to allow expert witnesses are committed to the sound discretion of district judges. *Berdeaux*, 528 F.2d at 990. And while that discretion is not limitless, the district court's decision to find the expert qualified in this case is supported by the record. The witness had a bachelor's degree in mathematics and a master's degree in technology management. He completed four semesters of graduate work and received a certificate in forensic document examination. He also attended seminars, gave lectures, and published three books on the subject. On this basis, although the district court described the expert's credentials as "thin," it was within the court's discretion to find that he was qualified. Given

---

[4] The Yehudas argue that the district court itself came to this conclusion when it stated: "I will not recognize him as an expert; I will recognize that [Rubinstein is] calling him as an expert." But context paints a different picture. After making this statement, the court requested a list of federal cases where the witness testified in order to learn why those courts recognized him as an expert. The court identified a case from California where the witness was permitted to testify, even though the parties identified similar issues with his credentials. Consistent with that case, the court allowed him to testify as an expert, acknowledging and rejecting the Yehudas' objection that he was unqualified. From this context, we conclude that the district court found the witness qualified as an expert, despite its earlier statement.

the limited scope of our review, we cannot say that this finding was an abuse of discretion.

### 3.    Punitive Damages Award

In the Yehudas' final contention, they contest the punitive damages award, making two arguments. First, punitive damages should not have been awarded at all. Second, the punitive damages award was so excessive that it violates due process. They say that the $2.5 million in punitive damages exceeds their net worth and would wipe out everything they have.

The Supreme Court has set three guideposts for determining whether punitive damages violate a defendant's due process rights: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1362 (11th Cir. 2004) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). The third guidepost is not relevant here because the parties have not identified a civil penalty that could apply in a comparable case. Therefore, our analysis turns on the first two guideposts.

Five sub-factors are relevant to the first guidepost, the degree to which the defendant's conduct was reprehensible. *Campbell*, 538 U.S. at 419. We must consider whether (1) the harm

caused was physical or economic; (2) the defendant's conduct showed indifference to or reckless disregard of health or safety; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions; and (5) "the harm was the result of intentional malice, trickery, or deceit" rather than accident. *Id.*

Rubinstein contends that the last two sub-factors weigh in his favor, and we agree. There was evidence at trial that the Yehudas repeatedly engaged in deceitful conduct to convert Rubinstein's property. This conduct included: forging documents, filing fraudulent annual reports, providing false information to Oceanside's accountant, and making false representations to the buyers of the hotel. The other three sub-factors weigh in the Yehudas' favor: the harm caused was economic rather than physical, the Yehudas' conduct did not pose a health or safety risk, and there was no evidence that Rubinstein was financially vulnerable.

A finding of reprehensibility, however, can rest on just two sub-factors—though the plaintiff might be entitled to a relatively smaller punitive damages award in such a case. *See Campbell*, 583 U.S. at 419 ("The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."). Here, there is sufficient evidence on the fourth and fifth sub-factors to support a finding that the Yehudas' conduct was at least moderately reprehensible.

The second guidepost has us look to the ratio between compensatory and punitive damages. As a rule of thumb, "a 4:1 ratio

will typically be close to the line of constitutional propriety and [ ] few awards exceeding a single-digit ratio to a significant degree will satisfy due process." *Williams v. First Advantage*, 947 F.3d at 763. Yet the Supreme Court has sanctioned much higher ratios where a "particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 749 (citing *Campbell*, 538 U.S. at 425); *see, e.g.*, *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 459, 462 (1993) (plurality of the Court upholding a punitive damages award that was 526 times the amount awarded in compensatory damages); *Kemp*, 393 F.3d at 1365 (allowing punitive damages of $250,000 where compensatory damages were only $115).

Most instructive here is our recent decision in *Williams v. First Advantage*, a Fair Credit Reporting Act case. There, the jury awarded $250,000 in compensatory damages and thirteen times that amount—$3.3 million—in punitive damages. *Williams v. First Advantage*, 947 F.3d at 744. After finding that three out of five reprehensibility sub-factors weighed in the plaintiff's favor, we concluded that the "[d]efendant's conduct was sufficiently reprehensible to warrant some amount of punitive damages," although the conduct "was clearly not at the highest level of reprehensibility." *Id.* at 754. Next, we held that the punitive damages award was constitutionally excessive. *Id.* at 762. We reduced the award to $1 million (a 4:1 ratio), reasoning that ratios exceeding single digits should be reserved for exceedingly reprehensible conduct. *Id.* at 765–66.

As in *Williams v. First Advantage*, the defendants' conduct here does not reach the highest level of reprehensibility. But the ratio of punitive to compensatory damages—roughly 1.7:1 before the reduction for failure to mitigate and 2.5:1 after the reduction—is lower than what we approved in that case and fits comfortably within the Supreme Court guidepost. Because Supreme Court guidance and our own precedent support the validity of the punitive damages award, we do not find it to be constitutionally excessive.

### C.    Mitigation of Damages on Cross-Appeal

Finally, we consider Rubinstein's cross-appeal. Again, before jumping to the merits, we must examine our jurisdiction. The rules of appellate procedure require the appellee to file a cross-appeal within 14 days of the notice of appeal. Fed. R. App. P. 4(a)(1)(A). Because Rubinstein's cross-appeal was filed 15 days after the Yehudas' notice of appeal, it was untimely. Yet the Yehudas raised no objection. The question, then, is whether the rule governing timeliness of cross-appeals is a jurisdictional rule or a claims-processing rule that can be waived if unobjected to.

We have held that the rule is jurisdictional. *See Hollins v. Dep't of Corr.*, 191 F.3d 1324, 1326 (11th Cir. 1999). Under our prior panel precedent rule, that holding remains binding "unless and until [it] is overruled by [our] Court sitting en banc or by the Supreme Court." *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). Five years ago, however, the Supreme Court addressed whether the rules of appellate procedure are jurisdictional.

*See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 21 (2017). At issue in *Hamer* was Rule 4(a)(5)(C), which limits a district court's authority to extend the notice of appeal filing deadline. *Id.* at 18. The Supreme Court explained that several Courts of Appeals had erred in holding that "the taking of an appeal within the prescribed time is 'mandatory and jurisdictional.'" *Id.* at 21. Time prescriptions, the Court held, are not jurisdictional where they are "absent from the U.S. Code." *Id.* "Because Rule 4(a)(5)(C)," rather than a statute, "limit[ed] the length of the extension granted," the time prescription was not jurisdictional. *Id.*

Though our prior panel precedent rule is muscular, and we have enforced it rigorously, it is clear that *Hamer* abrogated our circuit precedent. Because the timeliness of cross-appeals is governed by court-imposed, rather than Congressionally-imposed rules, it is not jurisdictional. *See id.* at 17; *see also In re IPR Licensing, Inc.*, 942 F.3d 1363, 1372 (Fed. Cir. 2019) (recognizing, without convening en banc, that *Hamer* abrogated a Federal Circuit decision holding that Rule 4(a)(1)(A) is jurisdictional). We therefore have jurisdiction to hear the cross-appeal. And though it was filed a day late, we will consider it because the Yehudas raised no objection.

That brings us to the merits of the cross-appeal. The jury reduced Rubinstein's damages by $500,000 for his failure to take action that could have prevented the sale of the hotel. Rubinstein argues that his inaction did not amount to a failure to mitigate damages. Under Florida law, mitigation of damages—also called

avoidable consequences—is typically directed at a plaintiff's action or inaction that occurs after the defendant's wrongful act and magnifies the resulting damages. *Parker v. Montgomery*, 529 So. 2d 1145, 1147 (Fla. Dist. Ct. App. 1988). As a paradigmatic example, "a plaintiff's failure to mitigate the effects of a broken leg by failing to obtain proper medical care *after* the accident may lessen his recovery for the subsequent aggravated condition of the leg." *See Ridley v. Safety Kleen Corp.*, 693 So. 2d 934, 942 (Fla. 1996). This doctrine is different than comparative negligence, which generally involves a plaintiff's ability to have avoided injury in the first place. *See id.*

To be sure, the Florida Supreme Court held in *Ridley* that the distinction between the two doctrines dissolves in auto accident cases where the plaintiff did not wear a seatbelt. *See id.* at 943. But the *Ridley* court expressly limited its holding to "the single issue" presented in that case: "whether a person's failure to use a seat belt has contributed to her injuries." *Id.* Outside of that context, it remains the rule that mitigation of damages applies to a plaintiff's conduct that comes *after* a defendant's tortious conduct. *See Coquina Invs. v. Rothstein*, 2011 WL 4971923, at *16 (S.D. Fla. 2011), *aff'd sub nom. Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014).

Rubinstein says that the Yehudas' tortious conduct was incomplete until they sold the hotel in 2017, after which he promptly sued. Any alleged inaction *before* the hotel sale is thus irrelevant,

Rubinstein argues.[5]  The Yehudas do not contest that mitigation of damages applies only to a plaintiff's action or inaction that occurred after a defendant's tortious conduct.  They argue, however, that Rubinstein's cause of action for fraud would have accrued in 2013 when the Yehudas allegedly misrepresented the permanency of their assignment to Rubinstein.  And as to the conversion claim, the Yehudas began holding themselves out as owners of the hotel by late 2015.  They argue that Rubinstein knew what was going on during 2016 and 2017, yet remained silent.  As a result, the argument goes, he failed to mitigate damages by failing to prevent the sale of the hotel.

Again, we agree with Rubinstein.  The instruction on mitigation of damages should not have been submitted to the jury because the evidence did not show that Rubinstein's inaction occurred *after* the Yehudas' wrongdoing and served to increase the damages he sustained.  *See Parker*, 529 So. 2d at 1147.  True, the Yehudas' tortious conduct began well before the sale of the hotel.  Their efforts to convert Rubinstein's interest in Oceanside, for example, began as early as November 2015 when they filed documents with the State of Florida.  But those filings did not complete the Yehudas' efforts to convert Rubinstein's majority ownership interest.  Rather, the Yehudas took a series of actions—filing annual

---

[5] Rubinstein offers a few alternative arguments that we need not reach: that the instruction was phrased incorrectly and that failure-to-mitigate is a defense to conversion only when the defendant offers to return the stolen property.

statements, forging documents, opening bank accounts, and so forth—to wrest control of that interest, and those efforts culminated in the hotel sale. There was no evidence that, once those efforts succeeded, the resulting damages were magnified by Rubinstein's inaction. Nor would it make any sense to say that Rubinstein's failure to stop the Yehudas from converting his property was a failure to mitigate his fraud damages.

To put it simply, the sale of the hotel did not aggravate damages Rubinstein had already sustained. We hold, consequently, that the district court erred in submitting this issue to the jury. The $500,000 that was subtracted from Rubinstein's compensatory damages should be reinstated, bringing the total compensatory damages award to $1.5 million.

## IV.    Conclusion

In conclusion, we hold the following. One, the district court had subject matter over this action, and we have jurisdiction over this appeal. Two, none of the issues raised by the Yehudas on appeal warrant reversal. And three, on Rubinstein's cross-appeal, the district court erred in giving a failure-to-mitigate instruction to the jury. We thus reinstate the $500,000 that the jury subtracted from the compensatory damages award.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**